Good morning. You can be seated. Thank you. Your Honor, this is the second case of the morning. Call 211-0602. Captain Stackhouse v. Royce Realty and Management Court at all. On behalf of the appellant, Mr. Timothy Shelton. On behalf of the appellant, Mr. John Conant. And gentlemen, we do have a third panel member. However, he is unable to be with us today. But he will be listening to the proceedings and rule on a case with us. Mr. Shelton, are you prepared? You can step forward. Good morning, sir. Good morning. May it please the court, counsel. I am Tim Shelton on behalf of defendant Appellant Royce Realty or we might as well say the golf course. This is the case, as you know, I believe, about a tree falling on the golf course. The tree that was on the golf course fell and struck the plaintiff. Although the jury awarded plaintiffs on $4.5 million, we maintain that the issue that requires reversal really is duty. It's not so much manifest way to the evidence as it is whether or not the evidence supported a finding that there was a duty of Royce to protect the plaintiff from its trees. The trial court, excuse me, I have a little cold. Do you need some water? No, I'm actually fine. I just had some. Thank you very much. I will have a little clearing problems. Anyway, the trial court found that there was no general duty to inspect the trees on a golf course because that would be unreasonably burdensome to require the golf course to take care of all of its trees. On the other hand, it found that there was a limited duty to inspect a tree that fell in 2006. This tree, the tree that hit the plaintiff, fell in 2008. Another tree fell in 2006 that was very close to the 2008 tree. And the court found there was a duty to inspect that tree because there was evidence. David Boone, the plaintiff's expert, said that had an arborist inspected that tree at that time, he would have had reason to also inspect the tree that fell in 2008 and would have had probably, he said, that tree would have been removed. Did the duty, did the trial court find more that the duty was owed based upon the voluntary undertaking? Both. We can talk about that first if you'd like. Those were the two findings. There was no general duty, but there was, the court found, a duty under voluntary undertaking. Do they kind of flow, don't they, Mr. Sheldon? Because if the employee hadn't said, I'll take a look at them, then maybe there would not have been an arborist even involved. I mean, did they kind of flow from each other? Well, I see how you're connecting them. The voluntary undertaking, though, has specific requirements in order to actually work as a doctrine of assuming a duty. I don't think those requirements were met, but we can look quickly at that. Apparently, Lopez, the caretaker, the superintendent on the golf course, said that he would have to have the trees checked out, that he evidently said this to a plaintiff. He doesn't recall it. Did he say checked out or have someone look at them? Maybe he said looked at them. The wording that I was interested in is I'll have to have someone look at them or check them. It's interesting, but I'm not quite sure at the moment whether he said look or check. I think he said look. Do they do the same thing? Does check and look? No, I think he said I'll have someone check them. We can solve this very quickly. I don't want to take the time. I could back down to the republic and make that clear. But it is different. It is different. That goes to some of the difference of whether you can visually just look at trees and see what's wrong or actually check them. But we know that he did nothing. The record is clear. The child court has found that Lopez and or Royce in any other capacity did nothing to act upon this statement. This puts us in the realm of non-feasance as opposed to misfeasance. And if there's non-feasance, then you go to reliance. And did she rely on his having undertaken an action? The court said yes based upon the deceptive appearance that action had been taken. Essentially because no action had been taken except the tree had been cleaned up, the 2006 tree. And no warning signs were put up. Wouldn't it have been non-feasance if he said to her, oh, oh, okay, and walked away? I mean, and I know the case you probably looked at and the case you relied on heavily was Bell v. Hupsel. And the non-feasance and the misfeasance in that case. And the parents in that case may have said to the son, hey, there will be no alcohol. But they didn't say that to the young man who went out and hit the tree. Therefore, it was never communicated to him. But in this case, it was communicated to the point of, hey, we'll check them. I'll have them checked or I'll check them, something to that effect. So is it really non-feasance? I see how you're looking at it as non-feasance. But is there not a difference between Hupsel? Or if you don't think so, why? Well, the reason I don't really think so is that I believe in Hupsel there was nothing done to follow up on a statement to the boy. And the court, I think, said through telling the boy effectively he told the boy's guests. Now, whether we think that, but the boy knew and that that was the program for that evening. The son you're talking about. The son, yeah. And having told him, I believe the court actually says this becomes effective notice to his friends. And I would have to find exactly where it says that. But I think it does. And my understanding, therefore, of the definition of non-feasance is you do make a statement. The parents in that case, we will not add alcohol. But don't do anything to prevent it from happening. Here, you say I will have to check and look at the trees. But you don't take any step to do it. As far as those factors for reliance go, I just urge the court to think realistically of this woman who walks frequently with her dog in the woods or in this area beside or on the golf course. She works for the golf course. She knows they have a policy to clean up debris and so on. The tree gets cleaned up. I'm sure she noticed. You notice your surroundings when you're out walking your dog. She goes, OK, the tree's gone. What else? Nothing. There's no sign of any other. There's no warning. There's no other stumps. Well, couldn't she have assumed that there was nothing wrong with that tree, that they checked it and there was nothing wrong with it? She didn't say check that tree. The idea was we should look at the trees. And obviously, there's no indication. And the wording of the rule is deceptive appearance that something has been done. That can be proved, I suppose, by a negative. Obviously, nothing was done. And that's the deceptive appearance. But I just think she would say, what's going on? They haven't done a thing here. And she also had every means to contact Lopez. She knew him. She knew the other people. She worked there. She lived there. And say, when are you going to get on this tree situation? Let me ask you something. What is our standard of review here? Is it different for each different issue we're discussing? That's a good point. I think not. I think it still is the manifest way to the evidence. I mean, even going to the question of law, which the duty questions still have. At this point, we have to say, does the evidence support a finding? I think when the court ruled against the directed verdict, again, it was an evidence question. At that point, the court should say, plaintiff has not met its burden of showing that there was a duty. My feeling with the limited duty is I find that sort of unrealistic concept in that it seems it leads right back around to a duty to examine all of the trees. You go and look at the tree that fell in 2006, and you see that there is some disease, and it had a reason to fall. But we have a problem. Yes, that might need you to think, let's look at the cottonwood over here. Because if you're an arborist, you know that this disease travels through the roots. But it's a very common disease. Yeah. And if it's in one area of the golf course, it's likely all over the golf course. That's my concern. So if you go to the next tree, then it's every tree. Yes, very likely in many trees. And then for that matter, if you straddle it from there and say we have a disease problem, here we may have a disease problem, a different disease even, in other trees. What about that group of cottonwoods over the ninth hole and so on? Let's eventually go back to what is the responsibility? The responsibility becomes to check every tree and make sure you get every tree before it falls. Well, at minimum, the tree that was right next to the tree. He had knowledge of a dangerous condition, that being the one tree. So now we're going to get to, we were talking about the analysis that we make, and I don't want to throw you off, but the four factors with respect to the duty. The reasonableness, the reasonable foreseeability, the likelihood of injury, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. So if you have two trees that are just next to each other, would it have been a huge burden on the golf course to check that tree next to it? And would it have been reasonably foreseeable for them to be able to guard against injuries to others by just checking out that one tree? Not every tree on the golf course, just that one tree. Probably not. I mean, I don't see that it would have been. They would have had to do the structural analysis test. They couldn't just look at it because at that time nothing was showing. I think what Justice Burkett suggested, I don't know whether he meant to go there or not, but is then where does this lead? I mean, it's fortuitous that they would have been fortuitous had they checked the nearest cottonwood and gone, oh, my gosh, and taken that down, and that tree never would have fallen on plaintiff, and we have a whole other story. But what if a different tree? Both parties agree that at the time of the 2006 incident, the tree in question here looked healthy at least visually. Yes. So it would have taken an expert or somebody who was familiar with the fungus to know that there's a danger that this other tree may become contaminated with the fungus, but absent hiring an expert, somebody on the golf course with that knowledge, it was not going to be discovered by simply having someone check. Yes, exactly. I believe the evidence was pretty clear from both experts, both sides, that to really determine what was wrong, you have to do this very test with equipment, mallets, and so on. We throw you off by asking. That's okay. That's what it's all about. Well, when you said, yes, the notice issue, I mean, this is to me, I'm just thinking about precedent really here, that did they actually have notice of a problem with the tree, the 2008 tree? The trial court says, yes, the 2006 tree put you on notice that you should do something about the 2008 tree. The other notice cases the trial court relies on, like Eckberg and Chandler, involve notice of a specific tree. The Eckberg tree fell, a part of it fell on motorcycle riders going by. The church that owned the property received a notice a week before that that tree was looking precarious. The same with the roots in Chandler. The guy said, your roots from that tree are coming into my garage. Here we don't have that direct notice. We have notice of a problem. And there's a trial court finessed it with a tree, a specific tree, or a group of trees. But group starts to get, or a, or all of your trees. I just wonder, so then do you go back, the alternative seems to be the natural conditions theory of Burns. But in this case, I think, and I see where you're saying the trial court's stretched, but if I recall reading the record, that you have two trees that you can basically touch. Because somebody did say that you can touch a tree. They're that close together. And so in the Eckberg case, you have this Gordon Bauer call and say, hey, there's a problem with this tree. So they have knowledge of a dangerous condition. How is it that, you know, that we, if we believe, or if the jury, which is more importantly, the jury, the reasonable jury believed that Lopez said, you know, I'll have someone check them. How could we say that it was unreasonable for the jury to assume that this meant that he was going to go get an expert to look at these trees? I mean, we're in a tough situation. You know, you told us what the standard is here. We're in a tough situation to say the jury's verdict was unreasonable. So how is this any different than Eckberg or the case that you cited with, let me see, with the roots coming up into the garage, Chandler versus Larson, or Mahern versus Lockhart? Yeah, there was evidently notice was not an issue in those. The issue was how specific was the property and how specific was the notice? Is it for us to question the reasonable inferences that the jury had made? And, well, I believe it is because it's a question of law, the duty. And then I think you have to question whether you decide. I know it's a very hard standard. I know what you're saying with the JMOB or directed verdict is hugely hard. And as plaintiff rightly pointed out in her brief, if there is some evidence to support it, and I think we have some, I'm wondering whether there's sufficient evidence, whether it really is sufficient, and where are we going with this? This will be an unusual case if it says, if it implies that a golf course has a duty to check the trees on the course that are natural. Trees are natural. They disease. They age. They fall. And it expands it from a notice of a very specific tree presenting a hazard to notice of a group of trees presenting, which the trial court slipped that in. And then does that mean which group, how many groups? And it really grows. And I don't know if this doesn't go off as a little pun intended. Yeah. It grows like those trees. Yeah. I think I better fall down. Okay. Did you want to address real quickly before you sit down, did you want to address proximate cause at all? Sure. I'll go very quickly. And mostly I think the briefs cover it. But I think the first part we always sort of discussed. The only duty that was actual plan that was proposed was a yearly check other than checking this one tree. But a yearly inspection, visual inspection of the trees. I think that was Marshall. The expert said that. And we already know that wouldn't necessarily catch this problem because it doesn't necessarily show up visually for even six months before it actually infects the tree and the tree falls. So that doesn't work. But so then the other one, so that's the duty specified by Marshall doesn't work. And then the other duty is the limited duty to inspect the tree. Does that lead? Does that solve the proximate cause question? And I propose no, because it is this rather fanciful notion that the boom proposed that if you inspect the downed tree in 2006, it would lead to an inspection of the specific tree that fell in 2008. I think that you don't have a direct link there with the proximate causal link. And I think it does lead to having to inspect all of the trees ultimately. And there's no case holding that a golf course has to do that. And we don't need to talk, well, maybe on the revo, talk a little about Burns if you like. Burns is an interesting case. Yes. All right. Thank you. All right. Thank you. We'll get back to Mr. Kornack. May it please the court. Counsel. My name is John Kornack. I represent the plaintiff. They're doing it happily here. The first person to testify to trial in this case was Kevin Plankner, the general manager of the golf course. He's also vice president of Royce Realty and Management. As part of his duties in that capacity, from time to time he would go to the golf course and he would make sure that the people at the golf course who were responsible for maintenance did their jobs properly. Part of that duty was to instruct them on tree maintenance and inspection policies. Mr. Plankner testified that he knew, understood, and appreciated the dangers associated with trees falling on the golf course, especially in places where people were likely to be present. He testified that he knew, understood, and appreciated that if a tree fell on the golf course in an area where people would have been present, it could cause serious injury or death. He acknowledged in his testimony that there are some trees on the golf course that are near the periphery. He said, I don't know which way they would fall, but if they fell, they could fall on or off property. He expected his golf course superintendent to investigate tree falls because of these concerns. He expected that his golf course superintendent would investigate tree falls like the one that happened in 2006 because he knew, understood, and appreciated that if a tree fell like the one in 2006 across the golf cart path where golfers and maintenance workers and other people would be located, if that tree could fall for no apparent reason, then other trees in that vicinity could also fall. That was his testimony. Well, this tree didn't fall for no apparent reason. There were also high winds, correct? Not the 2006 tree, Judge. 2008. The 2008 tree fell because of a number of, a confluence of things. But the primary reason it fell was because of the Ganonderma aplatinum infestation. That's what our expert said. And I don't mean to throw you off too, but I just wanted to address, and I didn't address this ahead of time, you raised jurisdiction. Yes. And Mr. Shelton, I think you addressed it as well in your briefs, but Royce filed a notice of appeal within 30 days of the trial court's denial of its written to 1202 motion. It did. Therefore, we feel we have jurisdiction. Their original motion was oral, and so they did put it in writing. The court ruled within 30 days. The court ruled, and they filed a notice of appeal within 30 days of that written motion. So I just want to put to rest the issue of jurisdiction. Fair enough, Judge. Now, after I throw you off, go right ahead. Kevin Plankner also expected his golf course superintendent to have the knowledge and wherewithal necessary to determine why a tree fell, like the tree fell in 2006. He expected him to do it. He expected him to have this ability, but we know from Cesar Lopez's testimony that he didn't have the expertise necessary to determine why a tree fell. It's very important for this court to understand that because what Mr. Plankner said was if Mr. Lopez didn't have the wherewithal or the knowledge, he should go and hire an arborist. Mr. Lopez said, had I been told by Mr. Plankner that that was what I was supposed to do, I would have done it. And we know what would have happened if an arborist were hired in this case because the jury heard the testimony. We have to accept that testimony from our expert, that if an arborist were hired, he would have looked at that 2006 tree, would have determined that it was suffering from ganoderma infestation. He would have prompted him to look at the tree that was three feet away from him. When we determine duty, we don't look at the testimony of that individual. We look at what a reasonable person in that position for all golf courses would do, correct? Well, sure. So this decision, whatever decision we make, is whether or not – well, you tell me, where do you see the duty? The duty in this case, and specifically what I would like to point out, the reason I'm bothering you with all these facts – Facts. The reason I'm bothering you with all these facts is because they are an opposite to the facts that Royce – the case that Royce relies on in this case most heavily, and that's the Burns decision. The facts in this case are polar opposite. In Burns, we had an open, obvious, and passive condition. In this case, we have a latent, dangerous, active condition. It's still a natural condition. It is. It is, Judge. It is, Judge. But the facts in this case are important. It distinguishes Burns, but that's not the only reason why Burns is not an – is inapplicable here.  There wasn't, Judge. There was no promise or no statement to take care of the roots. There wasn't, Judge. But again, the reason I'm harping on the facts is that there was a general verdict by the jury in this case. And in this case, there are facts in the record that would lead a reasonable jury to conclude that Kathy Stackhouse was actually off of Gulf Course property when she was struck by the tree. There was a disputed trial about that, because if you recall, both Royce and the other defendant claimed that Kathy Stackhouse was a trespasser. It was their burden to prove that she was on Gulf Course property. We disputed a trial. We argued in the alternative to the jury, and the jury certainly could have sided with our side of the case. If you recall, the only evidence that they provided at trial that she was on Gulf Course property was James Ware, the person who worked at the Gulf Course. He looked at – I think it was Exhibit No. 35 with the X on it and said, yeah, that's Gulf Course property. Let's not be mistaken about this. That was an opinion that had absolutely no basis. Then we look at Kathy Stackhouse's testimony, because if you recall, she also worked at the Gulf Course in 2002 in the very same job that James Ware worked at, so her knowledge base would be exactly the same as his. But in addition to that, she lived in that house next to the Gulf Course since year 2000. She testified in the case that her property extended to the maintenance path. She testified that she believed her neighbor's properties extended to the maintenance path. She testified that she cut the grass in this area from her back door in the maintenance path in full view of everybody at the Gulf Course, and nobody told her, hey, don't do that. That's our job. She had her family over for barbecues. They played football, badminton, frisbee in this area. Nobody ever told her, don't do that. Cesar Lopez testified that people from the residential area there would frequently use that strip of land to gain access to the lake. These facts pertain to my question. What is the duty? And I'm getting to that, Judge. The duty in this case, based upon the fact that the jury could reasonably conclude that she was off Gulf Course property, would be under Moran, Chandler, Eckberg, Jesus People, Belton, under those cases. And Moran, in particular, was the first in the long line of those cases that stood for the proposition that a landowner in a residential or urban area has a duty to third parties to exercise reasonable care to prevent unreasonable risk of harm from defective or unsound trees on premises, including trees of purely natural origin. That's what Moran held. That's what Eckberg held, by the way. They talked about the traditional rule that Royce wants you to apply to this case and the rationale behind it. And the Moran case said that rule of non-liability developed at a time when land was mostly unsettled and uncultivated. The landowner, unable to keep a daily account of and remedy all of the dangerous conditions arising out of purely natural causes, was therefore shielded from liability out of necessity. The next thing that they say, and this is the important part, while there are many reasons to continue the traditional rule in regions that are largely rural, there is little or no reason to apply it to urban and other developed areas. Well, Gulf Courses in particular are unique in tree management and having plenty of trees. Do you know how many trees are on this Gulf Course? I have no idea, Judge. Probably thousands. Could be. And people who buy land adjoining Gulf Courses, isn't there an assumption of risk that if you live next to large trees, high winds, a tree might fall? I'm not sure that that's true, Judge. You don't think there's any at all? If we walk anywhere in Lake County, there's going to be trees all over the place. Do we assume the risk that we're going to be struck by a tree? That's why there's no liability, general liability for natural occurring conditions. All right. And again, this is one way, and under Warren, what Warren did in these other cases where the tree was on one property and fell off on somebody who was off the property, they applied the traditional negligence rules. Nature of the locality, seriousness of the danger, ease to which it would be prevented. And I think I outlined the ease to which it would be prevented in this case, both in my argument there and my argument here. Were there any photographs showing that the tree was leaning at all before it fell? The tree that fell in 2008? Yes. No. No, there weren't, that I recall, Judge. Was there evidence that cottonwoods are particularly brittle and don't stand up very well to high winds? I think the evidence at trial was that cottonwoods are a pioneer species and they're fast-growing and fast-dying. That was the testimony. But, you know, that comes from the experts. But, no, let's put that aside. This one thing, let's follow Warren in those cases. And when we do, we have the same set of circumstances. We have a tree that they were put on notice that would have been dangerous. It fell and hit my client while she was off the property. So now you're talking about the voluntary undertaking. No, not at all. I'm not even getting there yet. This is just under Warren, Eckberg, and those lines of cases where we have a tree that the golf course was put on notice was dangerous, that there was a dangerous condition. It falls off the property and strikes somebody off the property. Under those sets of circumstances, the traditional negligence rules apply, and we win. The other way that Burns doesn't apply in this case is that Burns dealt with solely a natural condition. That's what Burns dealt with. Here there are facts in the record that could lead a jury to reasonably believe that the golf course artificially exacerbated the Ganoderma aplanatum infestation. Again, it's a general verdict. If you recall in Burns' decision, they relied heavily on the natural accumulation of snow and ice cases. Now, there's an exception to the natural accumulation of snow and ice cases, and I cited McCann v. Bethesda in my brief. And the whole thing there is that liability is imposed when the condition that caused the injury, while natural, is produced by artificial causes or in a natural way, or here's the key part, or by defendant's own use of the area of concern. So what were the facts that prove that? Our expert. Both trees affected with Ganoderma aplanatum. The most common way for this fungus to be introduced into an otherwise healthy tree is through the root system. Our expert went there on a site visit. He observed paths that were in close proximity to these trees. His opinion, and what the jury decided in this case, was as follows. The proximity of these two paths contributed to the tree failures in 06 and 08 because of the sheer compaction of the soil limiting the oxygen to the roots causing the breakdown. That was his testimony. That's what the jury heard. We have to live by those facts. So Burns, of course, it can be distinguished in three ways and not applicable in two of those. Well, Burns, you had some foot traffic going over the roots, correct? Potentially, but that was not even an argument that the plaintiff or the defendant made in that case. And, you know, our argument here is a little bit more sophisticated because we had an expert testify as to what the cause of the or what contributed to the tree failures in 06 and 08 and it was the use of the property. When should the inspections have begun? Well, I'm saying that in 2006 they should have done an inspection of the tree that fell. They should have because we know that what our experts said on liability is you have to have two things, an inspection process and somebody with the wherewithal to do the inspection. And as I pointed out at the beginning, Cesar Lopez didn't have any of those things. He had no wherewithal. He knows that if he didn't, he had to reach out and get an arborist to do it. So that's what would have happened. Well, how do we know and how is it that you believe the jury should have interpreted what Mr. Lopez said? I'll have someone check them to mean I'll have someone, I'll go get an arborist. And isn't it a little bit remote with the two-year period there? Well, there is a remote two-year period, but we're talking about at the beginning when this in 2006 when this conversation took place. Because understand, if we want to talk about the voluntary undertaking theory, I could move on to that. Because in a case involving nonfeasance, which I think the defense is arguing here, there has to be detrimental reliance on behalf of the plaintiff. So what are the facts in this case that the jury heard that they could reasonably conclude support that? Well, she worked with Cesar Lopez. She worked with him at the golf course. In fact, back in 2002, she supervised him. We also know that Cesar Lopez testified in this case, and he said, you know, I worked my way up from laborer to golf course superintendent. And you can reasonably conclude, and I argued on closing that, you know, he's got to have something on the ball. This is a guy with no real prior experience as a golf course superintendent, worked his way up to that position, and Kathy would have known that. Now, after she had this conversation, she had no reason to disbelieve him because she felt that if he said he was going to do something, she assumed it was going to take place. Then, from that point moving forward, there are no other tree falls for the rest of 2006, none in 2007. In fact, the tree that fell in 2006 was cut up and hauled away. Now, it's reasonable for her to expect that a golf course like Lakemore, someplace that she worked for, would take action in a case where there was a risk to golfers, maintenance workers and others walking that area relating to the condition of the tree. I mean, anybody in her position would reasonably think that, gee whiz, the reason I spoke to this person was because I was concerned about the health of the trees. He said he would do something about it, and based upon what I saw and continued to see up until the time that she walked out there with her dog in 2008, gave her nothing but satisfaction that it was done. So, are you submitting to us, Mr. Kornack, that she was in somewhat of a special circumstance in light of the fact that she worked at that club? I think there are strong facts in this case that are not present in any other voluntary undertaking cases because of the nature of the relationship there, because of her knowledge base, because of what she saw and did, and what Cesar Lopez did in this case. So, yes, there are special circumstances here. It's a very, very strong case. Do you agree that there's, with the defendants, that there are no, within the industry itself, not talking about this particular golf course, but just within the industry, there are no general standards for state safety-related tree inspections within the industry itself? Most of the standards have to do with tree management for the benefit of the golfing public, correct? Well, I believe that what our expert testified to, that there are standards in the industry. In fact, we pointed out the fact that there was an article that was written well before this happened that essentially said the same thing. He relied on that in formulating his opinions. In fact, when I cross-examined their expert, he was totally unaware of this. And it was interesting to me that the golf course superintendent that they hired said, there's no standards. And then he testified for about 15 minutes about how many different tree inspection policies he's had. He had different golf courses that he worked at. So, yes, there is. I disagree with that. I think that there is a standard. It's not going down. What are they? The standard is what our expert said. You have to have a tree inspection policy. You have to have some time limit, and you have to have somebody with the wherewithal to make the decision. To discover fungus in trees. To discover dangerous conditions in trees. So, yes, those are what you need to have. And this particular tree, the 2008 tree, withstood all the winds and all the storms that occurred between 2006 and when the tree fell in a tragic accident. As did all the other trees in that area. But if we're going to argue that the wind was the sole proximate cause of that tree falling, we have to consider that there were other trees in the area that didn't fall. Probably other weakened trees with the same disease. Well, we never got to that point because it wasn't an issue in the case. And I don't want to talk about, I don't want to talk out of school about what was done afterwards because it goes into the realm of subsequent remedial measures, and we were not allowed to testify. I have that testimony at trial, so I feel uncomfortable talking about that. But all I can say is that what the jury knew is that the tree fell in 2006, the same one, the 2008 tree had the same problem. Yeah, it was windy that day. But as our expert testified, those trees can fall at any time for any reason in any weather conditions, as exemplified by the 2006 tree. Mr. Cornett, before you sit, I'm going to let you address proximate cause briefly, as did Mr. Shelton, if you wish to. Again, the testimony in this case, in taking into consideration the experts, our experts, golf course superintendents, testimony that two things need to be proven or two things need to be done on the golf course, it's that second thing that proves the proximate cause here, that there has to be somebody at the golf course with the wherewithal to make the decision. And we know that reasonable people in that position, if that's their job and they can't do it, like Cesar Lopez testified in this case, they would go out and hire an expert to do it. That's what we're saying should have been done. That's what the jury relied upon. That was the testimony of our expert. And they did side with us on each and every element in this case. So when we talk about proximate cause, had they done what they said they were going to do, and by the way, we didn't ask them to do anything that they weren't willing to undertake all by themselves. So thank you, Mr. Cornett. Thank you, Judge. Mr. Shelton. Mr. Cornett went after your case here, the Addison Golf Club. So you wanted to address that, I think, before you sat down. It was Burns. Pardon? Burns. Yes. I forget that it was versus Addison. Right. Yeah, I did. And I think the problem maybe is that, as Justice Burkett said, golf courses are unique. I think Burns found that the tree root in that case on the path, however it came to be exposed, and they said whether it was foot traffic or whatever, was a natural condition. They said it doesn't affect our considering that to be natural. We maintain that the subject tree here, however it came to be diseased, constituted a natural condition on the golf course property. The problem with Burns for us, frankly, is the issue that was not resolved at trial where the tree, the injury actually happened. Was it on adjoining property? Burns distinguishes, whatever you pronounce that, and Chandler, on the grounds that the injury was to adjoining property, not on the property itself. So it was as a result of an unnatural condition on the defendant's property? No. In Burns. Correct? On the defendant's property, yes, yes. Adjoining property, yes, yes, yes. And we say that unnatural condition was still on our defendant's property, but it fell, and as Burns says, it fell onto adjoining property, possibly. This was not resolved in our trial, which does diminish the authority of Burns, I believe. So it's somewhat into question. How about when you have an unnatural condition and notice of that unnatural condition? Natural condition. Natural condition, yes. I think you, well, that goes back to the issue of notice. I mean, if you, Burns says that the route, and the court seized, trial court seized on this, the walker was aware of routes on her path. They were open and obvious, so to speak. And the trial court jumps to open and obvious. I think that's a mistake, an analytical mistake, because the Burns did not apply, as he says, we're not applying the open and obvious exception to a landowner's duty. We are applying the natural condition exception. And within the natural condition, there are provisos that there is no latent dangerous condition that the owner should have known about, knew about, or should have known about. And there's also whether the maintenance, whether you somehow exacerbate or aggravate the situation with the way you maintain the land. But it stayed within that realm. So I think the fact that our point is that Royce did not know that there was a problem with the 2008 tree, and that that's the equivalent of, that takes care of that proviso that goes along with the natural condition. The same way as the fact that this woman knew that there were exposed roots. Here's an issue. Trees of trees. You have the jury, her testimony from an expert, who said the 2006 tree had this horrible disease, whatever it was, some fungus. And the 2008 tree, which was within arm's length of the 2006 tree, could very easily have received the same fungus through the root system. And this is where I'm a little bit perplexed is, again, we get back to the standard of our review, and we get back to second-guessing the jury. Do you submit to us that there was not enough evidence for a jury to make this reasonable inference? I think that I return again to precedent and to the law. If this is a reasonable inference, and you can say, look at something that happened two years before this event and infer that that put you on notice that you should have fixed this back then. So the question should probably be, do you think that the jury made an unreasonable inference based upon the remoteness? Yes, I do. Because, yes, based on the remoteness in time, based on the fortuity, looking in hindsight, oh, yeah, we should have done, you know, going back to that tree. And based on the fact that there's so many other trees, thousands, what are we going to, what duty do we have? And that's why it goes to duty. I mean. You take them down as they fall. Is that what you're saying? Well, I'm saying that, yeah, we would have to. And unfortunately, they might fall. Even though the plaintiff told Mr. Lopez, hey, I think this tree is diseased. And assuming that this occurs, which we have to in order to determine whether or not a duty exists, we have to accept those facts. He said to her, I'll have someone check that. And he never did that. Yeah, there's no question that he never did that. And then. For you to prevail, we have to find that that did not create a duty. Correct? Yes. Yes. And I, again, back to misfeasance, non-feasance, and I don't want to go through all that again. But I think it couldn't have because I obviously just disagree that whether you see that nothing's been done means, oh, everything's okay. Nothing being done means that my man Lopez didn't do what he said he would do. Or my man Lopez had it checked out and there's nothing wrong with that tree. Well, that's what I mean by nothing. Yeah, exactly. That's what, you know, it's been done. Which is an issue. Nothing's happened, which means good. Nothing's happened, which means I better be careful out here. I don't know. And I don't want to be going to a new area of law because of golf courses. I know Burns just didn't have to go there because it recurred on the property. Off you get into the societal concerns with trespass and so on. And that becomes another thing, like you said, but maybe to live next to a golf course, you assume a greater risk than others. We didn't go there in the trial, I don't think, so that's not a part of this record. Anything further? No, I don't think so. All right. Thank you very much. Gentlemen, thank you so much for your time this morning. The court is now adjourned for the day. A decision will be rendered in due course. Thank you very much. Have a good day.